IAP8CAS1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4           v.                          17 Cr. 511 (SHS)

5  JUAN CASTILLO,

6              Defendant.

7  ------------------------------x
                                      New York, N.Y.
8                                     October 25, 2018
                                      5:15 p.m.
9
   Before:
10
                   HON. SIDNEY H. STEIN,
11
                                      District Judge
12
                      APPEARANCES
13
   GEOFFREY S. BERMAN
14      United States Attorney for the
        Southern District of New York
15 JORDAN L. ESTES
        Assistant United States Attorney
16
   SHER TREMONTE LLP
17      Attorneys for Defendant
   JUSTINE A. HARRIS
18 HEATHER Y. HAN

19

20

21

22

23

24

25

1      (Case called)

2              THE DEPUTY CLERK:  Counsel, please state your names

3      for the record.

4              MS. ESTES:  Good afternoon, your Honor.  Jordan Estes

5      for the government.

6              THE COURT:  Good afternoon.

7              MS. HARRIS:  Good afternoon, your Honor.  Justine

8      Harris and Heather Han for Mr. Juan Castillo.

9              THE COURT:  Good afternoon.

10             Please be seated in the courtroom.

11             Let me tell you what I have.

12             I have the presentence report dated April 18, revised

13     on May 14 of this year, along with the addendum and the

14     sentencing recommendation of 39 months, based on a guideline

15     range of 51 months to 63 months, with a guideline departure

16     under 5K2.2(3).  That's the recommendation of the probation

17     department.

18             In addition, I have the government's submission of

19     October 18, document 318, in which they are asking for a

20     sentence for this defendant within the guideline range, which I

21     took to be effectively the 39 months because it was also

22     building in the departure.

23             I have the defense sentencing memorandum on behalf of

24     Juan Castillo, along with the exhibits, the letters, the

25     certificates, pictures, and so forth.  I have read all of this.

1  And I also went to the vimeo.com site and I saw the video.  I

2  watched the whole thing with my staff.  Not that it was that

3  long.  I think it was about six minutes or so.

4          Is there any additional information I should have?

5          Ms. Harris.

6          MS. HARRIS:  Your Honor, we did submit a short

7  two-page letter on October 23rd.

8          THE COURT:  I am sorry that I left that off.  It's

9  right here.  I have read it.  It's document 323.

10          Anything else?

11          MS. HARRIS:  Nothing further, Judge.

12          THE COURT:  Ms. Estes, anything else?

13          MS. ESTES:  No, your Honor.

14          THE COURT:  Ms. Harris, have you and Mr. Castillo read

15  and discussed all of this information?

16          MS. HARRIS:  We have, your Honor.

17          THE COURT:  Do either you or your client have any

18  objections to the findings of fact in the presentence report?

19          MS. HARRIS:  We have no objections, your Honor.

20          THE COURT:  Government, do you?

21          MS. ESTES:  No, your Honor.

22          THE COURT:  Why don't you tell me what it is you want

23  me to know, Ms. Harris.  This is a difficult sentencing.  Tell

24  me what you want me to know.  And I adopt the findings of fact

25  in the presentence report.

IAP8CAS1

1          MS. HARRIS:  Thank you, your Honor.

2          We fully recognize the difficulties that this case

3   presents the Court.  We also believe, and I think have

4   attempted to present for your Honor, the very many reasons that

5   this case is a unique case.

6          THE COURT:  Everyone is unique.  I know what you mean.

7          Let me tell you how I see it in broad strokes, and

8   then you can respond.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  I do think that Mr. Castillo has altered

2  his behavior.  It does look like the Oetken sentence of a year

3  and a day was, in no small part, a wake-up call.  I don't see

4  anything in the information that indicates he's been involved

5  in any criminal wrongdoing since his release from what I'll

6  call the Oetken sentence -- that's the drug sentence --

7  sometime in 2014.

8    Do you agree with that?

9    MS. HARRIS:  Yes.

10    THE COURT:  Government, do you agree with that as

11  well?

12    MS. ESTES:  Yes, your Honor.

13    THE COURT:  All right.  That's all well and good, and

14  he certainly had an opportunity to engage in improper

15  activities because he's been out on bond, like anybody who is

16  not detained.  I do think his marriage and the birth of his

17  child has had a salutary effect here.

18    On the other hand, the Oetken sentence was for

19  conspiring to distribute crack cocaine and marijuana.  There is

20  significant criminal wrongdoing underlying the racketeering

21  conspiracy charge to which he's pled now, specifically the

22  shootings, which I don't think I can blink at.  Indeed, one of

23  the shootings, the December 28, 2011, ended up in shooting

24  somebody, the target.

25    In a way, it's better that the target was hit than an

1  innocent bystander, but that doesn't go very far.  The man

2  fired a weapon here and injured somebody.  Plus, the other

3  assaults, the aggravated assault in mid-2011 and the aiding of

4  the coconspirator in 2012, just can't be ignored.

5          Now, I understand that he's changed or has been

6  changing his way.  I think he now is a more responsible person.

7  I understand he was younger then, no question about it.  I

8  think I understand the evolving science here, but it's hard to

9  just, as it were, give a pass for the other wrongdoing, one;

10  and two, within this group of coconspirators, there does need

11  to be some allocation within the group.

12          At the same time, I agree with you, Ms. Harris, that

13  this is a unique case.  Every case is unique insofar as every

14  individual is an individual, but it's very hard for me to give

15  a pass, as it were.  And I'm overstating it for purposes of our

16  discussion, clearly.  What you're recommending is not a pass,

17  but I don't see my way to doing that.  The program that you're

18  asking for is, obviously, purposely a nonincarceratory program

19  but it seems to be education and helping with finding a job.

20  I've gone to their website also.

21          This defendant may have a job -- there's a letter

22  there that says he will -- at Shake Shack.  Obviously, it's not

23  a contract of any type, but it looks like a valuable,

24  worthwhile neighborhood program that tries to give young people

25  at risk education and assistance in résumés and education and

IapWcas2

1    job training.  I'm not sure that's adequate from a standpoint

2    of either punishment or general deterrence.

3           I've tried to give you a sense of my thinking.  Speak

4    to me.

5           MS. HARRIS:  Your Honor, you're right, that we are not

6    asking for a pass, and I think what makes this sentencing a

7    challenge for all parties, but I understand especially for the

8    Court, is that it really does go to the question of what

9    constitutes sufficient and ample punishment for this specific

10   conduct that was seven years ago.

11          THE COURT:  And general deterrence.

12          MS. HARRIS:  Correct.

13          THE COURT:  Let's assume he's well on the way to

14   rehabilitation.  Let's assume specific deterrence is not a

15   substantial issue here.  I think we're then left with general

16   deterrence and punishment.

17          MS. HARRIS:  Right.  The way I wanted to frame it,

18   obviously, is that here we are.

19          THE COURT:  And also talking about where he fits.

20          MS. HARRIS:  Yes.

21          THE COURT:  You don't have to adopt the government's

22   position, and I'll obviously hear the government, but the

23   government has him well within the middle range.  It's not as

24   if he's hanging on at the low end of the middle range.  He's

25   solidly in the middle range, as I read the government's

IapWcas2

1  position here.

2          Go ahead.

3          "Core member of Square Gang but tapered off after the

4  narcotics charge"; I'm quoting from their submission.

5          MS. HARRIS:  Right.

6          THE COURT:  Having asked you to speak, I'm not giving

7  you an opportunity to speak.

8          I must say I've also spoken to his prior probation

9  officer, who speaks quite well of him.

10          Go ahead.

11          MS. HARRIS:  And I think, your Honor, we agree.

12          I was going to start the presentation with just

13  talking about his rehabilitation, but I think in large part the

14  Court understands, appreciates and agrees that he has made

15  enormous progress.  But the one thing I want to underscore

16  before I address all the issues that your Honor just mentioned

17  and that were on my outline was that what's remarkable and, I

18  think, important about Mr. Castillo's rehabilitation and the

19  transformation that he really effected was that most of it was

20  not while he was under the threat of prosecution.

21          Many times I'm coming to court to talk about

22  postarrest, presentencing rehabilitation or someone gets

23  arrested and released on bond and then they turn their life

24  around while they're on supervised release -- pretrial

25  supervision, rather.

1          Certainly he was on a term of probation, supervised

2     release after released on the Judge Oetken sentence, but he was

3     making choices about where he wanted his life to go and who he

4     wanted to be without thinking that, three years later, there

5     was this case, the conduct of what happened when he was 17, 18

6     years old that was going to catch up with him.  And he made

7     those choices because he did grow up.  He did mature, and most

8     importantly, he became a father, and that transformed him

9     profoundly.

10          Now here we are seven years after the events in

11    question, four years after he was released on bail from the

12    Judge Oetken sentence, and close to 18 months after, as your

13    Honor said, successfully completing a three-year term of

14    probation.  And we now have to go back to that conduct seven

15    years ago and say, What additional punishment, in addition to

16    the 12 months and a day that he got from Judge Oetken, is

17    required by the law?

18          We know that no punishment is needed to protect the

19    public.  We also know that no punishment is needed, as you

20    said, for individual deterrence or for rehabilitation.  The

21    question is what punishment is needed, as your Honor just said,

22    for general deterrence, to promote respect for the law and

23    avoid unwarranted disparities.

24          Those are the issues I want to address now.

25          As to general deterrence, first and foremost,

1    obviously, your Honor, this was a group crime, and a group has

2    been charged.  Your Honor has imposed substantial sentences on

3    many of the individuals involved, and that obviously

4    achieves -- whatever general deterrence effect is achieved by

5    long sentences, that message has been sent loud and clear.  But

6    beyond that, I think the literature that we tried to cite to in

7    our submissions also suggests that the length of the sentence

8    actually does not have any correlation with general deterrence,

9    with crime rates even in specific sort of categories of

10   criminal conduct.

11              Rather, the important thing, the thing that actually

12   deters is the certainty of getting caught.  It's the

13   law-enforcement moment when they're actually arrested.  It's

14   the moment of the arrest that has the greatest deterrent

15   effect, and general deterrence is not actually furthered by

16   lengthy sentences or by whether it's five months, one month,

17   probation or five years.  There's no actual literature or

18   empirical research that can correlate the length of a sentence

19   with general deterrence.

20              Beyond that, it's especially true with this kind of

21   conduct that we're talking about.  If we're trying to deter, if

22   we're trying to send a general deterrence message to

23   17-year-olds in impoverished neighborhoods, in violence-ridden

24   and drug-ridden neighborhoods, the length of the sentence that

25   the federal judge imposes on someone they know is not going to

1    be the deterrent message.  These are group crimes that are

2    impulsive crimes, often; that are driven by factors that are

3    not -- they're not rational actors.  The brain science says

4    they're not rational actors.  They have a lot of other economic

5    and sociological pressures that are driving them to make the

6    choices that they make.  The social science literature suggests

7    that, unfortunately, the length of the sentence doesn't bear a

8    strong correlation or can't control the conduct that deterrence

9    is aimed at.

10            With respect to the unwarranted disparities, look, we

11   believe very strongly, and I think we tried to make a case for

12   this in our reply submission, your Honor, that Mr. Castillo's

13   conduct is really very much akin to Mr. Berger's conduct.

14   That's an individual your Honor sentenced to 20 months'

15   imprisonment.

16            The government, in its sort of rating of the

17   hierarchy, said that Mr. Berger was less culpable because he

18   also was a triggerman.  Both of them, both Mr. Castillo and

19   Mr. Berger, were present for three shootings.  OK?  Both of

20   them actually pulled the trigger in one shooting.  Mr. Berger

21   was 15; Mr. Castillo was 18.  That three-year difference in

22   age, I don't think, is a significant distinguishing factor for

23   purposes of assessing culpability.  In terms of placing him

24   relative to the group --

25            THE COURT:  Was the victim hit?

1    MS. HARRIS:  I do not believe he was.

2    THE COURT:  Did Mr. Berger actually shoot somebody?

3  My notes don't indicate that that's the case.

4    MS. HARRIS:  I understood he had the gun, your Honor.

5    THE COURT:  No.  My notes say he was the actual

6  shooter in one incident --

7    MS. HARRIS:  But he did not hit someone.

8    THE COURT:  -- just as this defendant was.

9    He did not?

10    MS. HARRIS:  He did not hit someone, your Honor.

11    But again, with respect to assessing the state of mind

12  and the culpability and the responsibility of the individual

13  who's being sentenced, I understand that one -- I mean, it

14  could be coincidence.  It could be moral luck.

15    "Luck" might be the wrong word.

16    THE COURT:  No, no.  It's serendipitous fortuity, you

17  mean, of whether somebody's hit or not.

18    MS. HARRIS:  Correct, your Honor.

19    THE COURT:  Yes, but that may cut the other way,

20  because the real damage, the real crime was the shooting.  It's

21  fortuity that somebody is hurt or not hurt.

22    MS. HARRIS:  Exactly, your Honor.

23    In that sense, the fact that Mr. Berger did not hurt

24  somebody I don't think makes him in a materially less culpable

25  role than my client.

IapWcas2

1          THE COURT:  On that point, I think you're right.

2          MS. HARRIS:  Right.

3          I think in that respect we want to situate him in,

4    aligned with Mr. Berger for those purposes, because they were

5    both very young at the time that the events took place.  And I

6    think the biggest difference here, though -- Mr. Berger was

7    sentenced to 20 months.  But Mr. Berger, unlike Mr. Castillo,

8    did not have any intervening punishment.  For the gang conduct

9    he was involved in during that period, when he appeared before

10   your Honor, he had yet to be punished for any of the conduct in

11   connection with the gang activity.  He had not been in the

12   Judge Oetken case.  He had not been arrested or prosecuted or

13   sentenced to any time.

14         He may have been in good shape -- I mean, he may have

15   been less involved in the gang at the time of sentencing.  I

16   obviously can't speak to his personal circumstances, but a

17   significant distinguishing factor is that Mr. Castillo served a

18   year and a day for gang-related activity.  Mr. Berger had

19   served no time, and he was sentenced to 20 months.

20         If we're looking at the baseline, if we're just

21   looking with a narrow telescope of what other defendants were

22   sentenced to who were involved in similar conduct, I would look

23   at the 20 months and I would then credit Mr. Castillo's 12

24   months and a day against that 20-month sentence Mr. Berger

25   received.

1    I obviously don't think that the pure, and I don't

2    think that the statute, 3553, contemplates taking only

3    unwarranted disparities or looking only at the relative

4    culpability as the only factor.

5    THE COURT:  No, it doesn't.

6    MS. HARRIS:  The Court's not going to do that,

7    obviously, but if we were to do that, I think that would be the

8    baseline to start from.

9    Interestingly, if you look, then, at the other

10   individuals, there were a number of other individuals in this

11   case who also were prosecuted, obviously, in the Judge Oetken

12   case.  And comparing Mr. Castillo to those individuals, one of

13   them, Mr. Goodwin, obviously, had not received -- he didn't

14   receive any incarceration.  He had a sentence essentially of

15   time served in that case.

16   THE COURT:  Not here.

17   MS. HARRIS:  No, no.

18   THE COURT:  Not before me.  You're talking about

19   before Judge Oetken.

20   MS. HARRIS:  I'm saying Judge Oetken.  He came to the

21   court without having any time in prison, intervening time in

22   prison, which would mean that the criminal conduct that the

23   Court is being asked now to impose sentence for, he had no

24   intervening time in prison.

25   THE COURT:  I'm sorry.  Do that again.

IapWcas2

1    MS. HARRIS:  Sorry.  I apologize.

2    I'm looking at the individuals who are in this case

3    before your Honor who also were in the Judge Oetken case.

4    THE COURT:  All right.

5    MS. HARRIS:  I'm not suggesting that Mr. Castillo's

6    similarly situated in terms of culpability as to those other

7    two, but I want to compare them because I think it's a useful

8    benchmark to say what happened with those individuals.

9    THE COURT:  All right.  I'm following you.  But

10   certainly Goodwin didn't get no time in the Oetken case.

11   MS. HARRIS:  He did, your Honor.  He got -- maybe it

12   was a sentence of time served.

13   THE COURT:  Time served might be years.

14   Government.

15   MS. HARRIS:  He was out on bail, your Honor.

16   MS. ESTES:  I think that's right.  I think Reggie

17   Goodwin got no time.

18   THE COURT:  All right.

19   MS. HARRIS:  And Mr. Sable, who was the other key

20   individual, received 15 months, but unlike Mr. Castillo, he

21   continued to engage in violence.  I believe that one of the

22   predicate acts that he's being held responsible for in this

23   case was actually committed while he was on supervised release

24   on the Judge Oetken case.

25   THE COURT:  But Sable wasn't a shooter in either of

IapWcas2

1    the two shootings and he, in essence, got 48 months.

2              MS. HARRIS:  Your Honor, but he continued.  He

3    continued to engage in violent acts after he had served time on

4    the Judge Oetken case.  He'd been put on supervised release,

5    and instead of turning his life around, moving out of the

6    Bronx, being a stay-at-home dad, like Mr. Castillo -- I mean,

7    I'm not saying that's the only way to do it, obviously, but

8    it's a fairly exemplary way to do it.  He continued to engage

9    in violent criminal behavior, so he's totally differently

10   situated with respect to how he responded to that first

11   sentence.

12             THE COURT:  Right, but that distinguishes him from

13   somebody who was sentenced to 48 months.  I say 48 months

14   because he was given credit for the 15 months.

15             MS. HARRIS:  Your Honor, with respect to similar, I

16   want to place him with Mr. Berger.  Right?  Because Mr. Berger,

17   three shootings; they were both the shooter in one.  They were

18   both very young at the time, and it's now seven years later.

19   Mr. Berger received 20 months, and he'd never served any prior

20   time, so I want to say 20 months minus the year and a day that

21   Mr. Castillo already served.

22             I think what's important about comparing him to the

23   other individuals who were prosecuted in the Judge Oetken case,

24   your Honor, is that here, in hindsight, we now know what courts

25   and judges often don't know at the time of sentencing.  I know

1    it's not an exact science.  We can't know exactly what is the

2    number that's sufficient but not greater than necessary to

3    achieve the statutory purposes.  And here, he served his year

4    and a day and he turned his life around.  He's stayed out of

5    trouble, and so we now know that that sentence was sufficient

6    for those purposes.

7           In this sense, in terms of comparisons, I think it's

8    very important, and I would ask your Honor, when we're thinking

9    about relative culpability and how to place him in comparison

10   to the other individuals, to think about the *Gall* case.  *Gall*,

11   I understand, wasn't a violent crime, but other than that, the

12   Supreme Court's decision in *Gall* is very much akin to what your

13   Honor is facing here.

14          There were three individuals in *Gall*.  Two of them

15   received sentences of 35, 37, 39 months, something along those

16   lines, and then the third defendant, Mr. Gall, was an

17   individual who had turned his life around, gone to college,

18   finished college, opened up a business, and the judge imposed a

19   sentence of probation.

20          Among the government's complaints in that case was

21   that the other individuals who were involved in the same crime

22   were sentenced to much more, and the Supreme Court explicitly

23   said that in sentencing an individual, even in a group crime

24   where others are receiving harsher punishments, the court was

25   obligated to take into account the transformation, the

IapWcas2

1  rehabilitation, the changed circumstances of that individual

2  defendant.

3           I understand.  It's not a pass, and I want to talk

4  about that a little bit, because really, I know it feels like

5  that in some way.  To say no jail feels like, in sort of

6  traditional mode, it's not even a slap on the wrist.

7           THE COURT:  It's not even a?

8           MS. HARRIS:  I know it feels like it's not even a slap

9  on the wrist.  And I want to talk about that, because I think

10  there's a different way to think about it, which, if your Honor

11  will indulge me, I just want to address.

12           We talked about it a little bit in our papers.  There

13  is always a sort of gut-level response that when there's a

14  crime there has to be a proportional response; there has to be

15  some kind of hammer that has to come down to respond

16  proportionally to the harm that was committed.  I fully

17  understand that, and I think that, obviously, much of our

18  system is built on that fundamental premise, but I do think

19  that it's wrong.  It's wrong that there is this only one

20  option; that we always go to that one thing, incarceration, as

21  a way to fix the wrong or to balance out the crime or to force

22  an individual to make amends in that way, that that's the only

23  way to do it.

24           There are other ways to do this, and I'm not just

25  talking about making him go to a community service project.

1 What I'm proposing, your Honor, is something, I think, slightly

2 more profound and that's going to force him to engage with the

3 conduct that he committed and the choices that he made when he

4 was a young man.

5        Gang activity is dangerous.  It pulls apart

6 communities and it makes it unsafe for everyone in the

7 community, and especially for children, children like Juan's

8 daughter, to grow up in.  Whatever we call it, restorative

9 justice or community service -- and we, maybe, don't have the

10 right word for it, but what we're asking for this Court to do

11 is to mandate that Mr. Castillo give back in an active and

12 purposeful way to the community; to mentor, maybe to work with

13 teenagers, to work with antigun groups, to really confront the

14 issues that he contributed to, the wrongs and the bad conduct

15 that he contributed to, and make him help fix his community,

16 which continues, obviously, to suffer from those same problems

17 to this day.

18        Now, obviously I don't have a specific program all set

19 up.  What I've done is make outreach into the community where

20 people would be willing to work with him and place him

21 accordingly.  And I want to say this is not something I could

22 make up for any client, your Honor.  If you read the letters

23 that are attached to the submission, there are letters from a

24 good friend who works for a youth group that speaks highly of

25 Mr. Castillo's activity with youth in the community already,

1  again, before there was any threat of prosecution, not as a

2  gimmick to come to court for sentencing but because that's

3  naturally what he does.  He goes to basketball tournaments and

4  helps his friend at the youth organization.

5          There's a letter from a woman here with four sons,

6  ranging in age from 10 to 17, and she had each of her sons

7  write a letter because of the special relationship that they

8  each have with Mr. Castillo.  And of course, there's the letter

9  from his sister-in-law who has an autistic son who has a

10 particular bond and connection with Mr. Castillo.

11         This is an individual, your Honor, who is ready and

12 able to connect with people in his community in a way that

13 would be meaningful and make amends in a substantial way for

14 the communities.

15         I was a Federal Defender in Brooklyn for many years,

16 and I've been doing CJA work for many years, and I know your

17 Honor has seen many, many cases from many different parts of

18 the city over the years, and for the communities that

19 Mr. Castillo comes from, mostly minority communities in the

20 Bronx and now where he's living, in East Harlem, I would submit

21 that these alternatives to sentencing are perhaps more

22 meaningful if we're talking about promoting respect for the

23 law.

24         Incarceration certainly is punishment.  We all agree

25 that is one way to punish someone.  But we also know that it

IapWcas2

has inflicted, and it does inflict, injury not just on the

individual, because I'm not here just saying, Oh, he doesn't

want to go to jail.  But it inflicts injury on the communities

and the families that surround individuals who go to jail.  It

inflicts its own kind of damage.  And here, your Honor knows,

and we've showed your Honor in the letters and the video, it's

obviously going to inflict damage on the community and the

family, who is all here in court with Mr. Castillo.  It's going

to inflict damage on them and, most tragically, on his young

daughter.

THE COURT:  That's always the case.

MS. HARRIS:  It's always the case.

THE COURT:  That's always the case.  It's a shame.

I'm tempted to say it's a crime that the burden of the

punishment would fall on completely innocent people.

MS. HARRIS:  Correct, your Honor.  And here's the

thing.

We fully recognize that it's his decisions and his

life choices that brought this moment and the consequences on

his family -- as a result of his choices.  But in a situation

where he has rehabilitated and there are other options for the

courts, the needs of those dependents and the individuals that

surround him can be considered by your Honor and, in fact,

should be considered by your Honor.

As I think Megan Castillo's letter says, she

1  understands that everyone who goes to jail, maybe, has a child

2  at home and there's not a blanket reduction that comes, Oh, you

3  have a child at home.  But the tragedy here is, because of the

4  timing of the prosecution, that Mr. Castillo's daughter -- her

5  language is better than mine, your Honor, but she says that the

6  tragedy would be that he would be getting sentenced for the man

7  he was, for the child he was or the man he was before she even

8  existed.  The timing of this is such that it's from seven years

9  ago, when he was not yet a fully formed adult himself, and now,

10  at age 25, having spent two years as a stay-at-home dad; I

11  think those factors should certainly be taken into account.

12          Again, what I was trying to say, and perhaps I got a

13  little off track, but because incarceration inflicts this

14  damage on communities, and those communities, not just his

15  immediate family, but the communities at large bear the price

16  of absent fathers and absent sons.  That does real long-term

17  damage to children that are separated for a long time from

18  their parents.  If we're talking about promoting respect for

19  the law, a sentence that recognizes who Mr. Castillo has

20  become, the father he's become, the responsible citizen that

21  he's become, the personal transformation that he's

22  accomplished, I think a sentence that truly recognizes all of

23  those factors will do more to promote respect for the law than

24  a traditional sentence of incarceration that will wreak

25  enormous destruction on a very tight-knit family and leave not

IapWcas2

just his daughter and wife but his nephew, the people around

him, suffering for a long time.

Your Honor, I'd be happy, if your Honor's willing to

consider a very intensive, restorative-justice alternative

model, and these are models that are not just community service

programs, your Honor; they're models of diversion that are

being used by court systems, like, in the Bronx.  They have a

diversion program that avoids prosecution of certain violent

crimes by referring them to restorative-justice programs.

These are considered real models in thinking differently about

punishment, and I would be happy, if your Honor wanted to

adjourn, to come back to the Court with a very specific

proposal, if your Honor was willing to consider it.

THE COURT:  Well, it was hard for me to really

understand, from the website that you gave me, what the program

you were suggesting there was.

MS. HARRIS:  Your Honor, that was an individual there

that I was able to reach.  I made outreach to several

organizations.  I'm not a social worker, nor am I experienced

in the Bronx, but the woman there that I spoke with -- there's

a citywide program called Cure Violence.

THE COURT:  That's on the website.

MS. HARRIS:  Right, but it's actually administered

through, I think it's the Manhattan -- it's through City Hall,

your Honor.  It's public funding, and then it gets administered

1   through different nonprofit centers around the city.  And

2   they're a center that administers one of those programs.

3           THE COURT:  But that program, and I'll let you finish,

4   appears to be, as I said, Cure Violence, was to help people get

5   their résumés together for jobs, help people get into

6   educational programs, help people get jobs, help them with

7   illiteracy.  That's what it seemed to me.

8           MS. HARRIS:  Sorry.

9           I think the program that Cure Violence is, they

10  actually have a model called Interrupting Violence, and they

11  have individuals, and I have no idea whether Mr. Castillo -- he

12  has to be screened and processed for this, but there are actual

13  interrupters, violence interrupters who are trained to go into

14  the housing projects, work with the kids who have the guns and

15  be involved in a very hands-on way in de-escalating violent

16  situations.  So that is the program that Cure Violence, I

17  think, many of the Cure Violence programs are.  They may have

18  ancillary social service programs, which was maybe what your

19  Honor saw on the website.

20          But when I spoke to her, it would involve him meeting

21  with her, having that referral.  It's almost like a job, doing

22  that.  But that's one possibility.

23          The literature on restorative justice says it has many

24  different models.  There are some where you sit face to face

25  with the victim and you have a restorative-justice circle.  I

1   think the victim here, your Honor, is himself incarcerated and

2   a shooter himself in many other shootings.  If that's something

3   that would seem meaningful to the Court, that is something

4   which we could contemplate as well.

5            THE COURT:  It does not.

6            MS. HARRIS:  Right.

7            THE COURT:  Go ahead.

8            MS. HARRIS:  I didn't propose that, but also, your

9   Honor, the idea here, what I was trying to propose is that

10   really the restorative justice, the amends that Mr. Castillo

11   needs to make and wants to make are to the community.  Right?

12   Because it's violence, it's the drug dealing, in the community

13   that he belongs to and that he still loves, although he's in

14   East Harlem right now, that he's raising his daughter in.  So

15   to make amends to the community in a meaningful way, to work

16   with youth, either through an antiviolence project, to work

17   with youth through a precinct project, in a way that is close

18   to the issues that he himself was involved in, I think, would

19   be a meaningful way for him to make amends.

20            Again, I would welcome the opportunity, with the

21   Court's blessing, to go to these organizations and say if he

22   receives a sentence of probation, let's set up something

23   intensive, rigorous and, frankly, in some ways harder than

24   incarceration.  I don't mean —— look, being incarcerated is

25   awful and terrible and makes the individual suffer enormously,

IapWcas2

1  so that's very hard, but harder in the sense that it requires

2  an active engagement in a way that incarceration doesn't.

3          THE COURT:  All right.  I understand.

4          Let me hear from Mr. Castillo.

5          Mr. Castillo, you have the right to tell me anything

6  you want.  I do want to inform you that anything you say can be

7  used against you, and you have no obligation to say anything,

8  but if you do wish to say something, here I am.

9          THE DEFENDANT:  How you doing, your Honor?

10          THE COURT:  Speak loudly, sir.

11          THE DEFENDANT:  How you doing, your Honor?

12          I'm very regretful for my actions in 2011.

13          MS. HARRIS:  Slow it down.

14          THE COURT:  It looks like you're reading from

15  something.

16          THE DEFENDANT:  Sorry.

17          THE COURT:  When people read and they're nervous, they

18  do it very quickly.  I need to hear and understand you, and the

19  reporter needs to be able to take it down, so read slowly.

20          THE DEFENDANT:  I'm very regretful for my actions in

21  2011.  I regret bringing violence to my community.  If I could

22  take it back, I would.  I realize I can't, though, so I would

23  like the opportunity to give back to the community that was

24  affected by the type of violence I caused as a teen.

25          I'm not the person I was then.  Sitting in jail for a

IapWcas2

year, being away from my family, gave me the time to think about what I did, and I realize I never want to be that person again.  Spending three years on probation kept me focused on bettering myself.

Since coming home in 2014, I stayed out of trouble.  I had a job for a year.  I completed certificates, but nothing compares to being a father to my little girl.  I've been her main parent for most of her life, and she keeps me focused.  I understand how serious the crime I committed was.  Time in jail, probation, working, school and my wife and daughter all helped me to become a productive member of society so I can raise a productive member of society.

I accept whatever sentence the Court decides to give me, because I know the seriousness of my crime and the negative impact I had on the community, but I also respectfully ask that your Honor take into account the man I have become, not just the child I was.  My life no longer revolves around gangs and violence.  The only acceptance I look for now is the acceptance of my wife and my child.

I would love to help other young men find another way to get away from gangs and violence too.  I just want them to know this is not the way; nothing about this is cool, fun or OK.  It's the biggest regret of my life, and I just want the opportunity to make amends to the community and help my daughter be a better person than I was.

1          Thank you.

2          THE COURT:  Thank you.

3          Government, what would you like to say?

4          MS. ESTES:  Yes, your Honor.

5          We recognize this is a hard case given the time and

6  the conduct, but we took that into account in negotiating the

7  plea and the plea offer we gave and in allowing the departure

8  there.

9          THE COURT:  It's not that you're allowing the

10  departure.

11          MS. ESTES:  Well, not -- or putting in.

12          THE COURT:  It's called for by the United States

13  Sentencing Commission under 5K2.23.  It's not your largess.

14          MS. ESTES:  Your Honor, there are cases where we would

15  dispute that it applies, particularly when the main, driving

16  force of the guidelines here is actually the shootings, not the

17  drug conduct.  And we didn't have the defendant plead to a

18  firearms offense, but I mean, your Honor, we submit that a

19  sentence of probation here would, frankly, just be unfair given

20  the other defendants in the case, given this defendant's role

21  compared to those other defendants.

22          Mr. Ratti, who was largely involved in drug dealing,

23  got one year and a day.  He did not shoot anybody.

24          Mr. Sable, who aided and abetted two shootings, got a

25  significant amount of time.  And Ms. Harris made the point that

IapWcas2

1    one of those shootings was after the Judge Oetken case, but

2    Mr. Vu came in, and they made a very good pitch that Mr. Sable

3    had also turned his life around, that he was living at the time

4    of sentencing a really reformed life.  So I think this is

5    something that often happens in cases.  People do grow up.

6    They do make amends of sorts, but there has to be punishment

7    for shooting people.

8          I've met the victim of the shooting.  He was shot in

9    the arm, your Honor.  I mean, this is something -- the

10   defendant here is so lucky that he was shot in the arm.  I

11   mean, that could have just as easily gone right in the chest,

12   right in the head, right there.  There has to be punishment for

13   that sort of thing.

14         I think your Honor was right.  You were noting that

15   general deterrence is something that's important here.  I mean,

16   it has to be that people see that you can't just shoot

17   somebody, hit them and then get away with it.  You know, even

18   if you do, a couple years later, turn your life around, if you

19   shoot somebody, that is a big deal.  People need to be deterred

20   from shooting people, even when they're young.

21         THE COURT:  But Ms. Harris's point, I think, is that

22   the empirical evidence is muddled, let's say, in terms of

23   deterrence.  It's unclear in terms of the deterrent effect of

24   sentences.  I'm told that the empirical evidence is that there

25   essentially is no effect on the longer the sentence the greater

IapWcas2

1    the deterrence.

2            Defense, is that essentially your understanding of the

3    studies?

4            MS. HARRIS:  Yes, your Honor, and the deterrent effect

5    is accomplished by the arrest itself.

6            MS. ESTES:  Your Honor, putting aside the length of

7    the sentence, I think the fact of probation, though, is going

8    to have no deterrent effect at all.  I mean, maybe it's true

9    that a sentence of two years versus five years isn't going to

10   make a huge difference.

11           THE COURT:  I'm sorry.  I don't mean to interrupt you,

12   but I did.

13           The point that Ms. Harris is making is there's no

14   deterrent effect needed.  Deterrence has taken place by virtue

15   of age, maturity and a 12-month-and-one-day sentence that he's

16   already served and the supervised release sentence that he's

17   already successfully completed.

18           MS. ESTES:  Your Honor, I think that goes to specific

19   deterrence.

20           I think we also need to deter 18-year-olds in the

21   Patterson Houses from doing shootings.  And let me be clear.

22   Everybody from the Patterson Houses knows about these cases.

23   They follow these sentencings.  They know what people are

24   getting, and they are going to hear that he gets probation;

25   that he shot somebody and that he hit him and that he got

1    probation.  That would be known.

2           In general, I know Ms. Harris has studies, and I just

3    have anecdotes from people who live in the Bronx, but they hear

4    about the federal government.  They know when you're charged by

5    the feds that it matters.  They know that people get real

6    sentences here compared to what's in the Bronx.  If people

7    start hearing that in the federal government you can shoot

8    somebody and you just get probation, people aren't going to

9    care anymore.  They're not going to be worried that the feds

10   are coming after that.

11          THE COURT:  In light of the sentences in this case?

12          MS. ESTES:  Your Honor, I think, I mean, they will

13   hear about this one.  They hear about every sentence, and I

14   think it will resonate that one person didn't get probation.

15          THE COURT:  If I were Ms. Harris, I would stand up and

16   make the argument:  Exactly right; word will get out that if

17   you turn your life around, things are going to be better for

18   you and the way to avoid prison is to turn your life around and

19   become a solid citizen.

20          If I were Ms. Harris, that's what I would say.

21          MS. HARRIS:  Your Honor, then people will think, Oh, I

22   can get away with whatever I do and then a year later I'll just

23   change my life, but as long as I don't get caught for a year,

24   I'm going to be fine.

25          I don't think that's something he can actually have

IapWcas2

1    coming out of this.

2           Just going back to the disparities, your Honor, I do

3    think that should be a driving force here.

4           Mr. Sable made an argument that he'd changed his life.

5           Mr. Berger was 15 when he pulled the trigger.

6    Mr. Castillo was 18, and Ms. Harris seems to think that

7    difference doesn't matter, but in the law all the time, we

8    treat that as a very substantial difference.  When you're 15,

9    you're a juvenile.

10          THE COURT:  It's a difference.

11          MS. ESTES:  When you're 18, you're an adult, and we

12   submit that is important.  That does matter.

13          Also, in terms of how our cooperators describe people

14   involved in the gang, they always described Mr. Castillo as a

15   core member of the gang.  He was a core member.  He was

16   somebody involved from the beginning, whereas Mr. Berger was

17   this sort of younger kid.  I mean, so that's just kind of in

18   the description of this gang the impression we get from our

19   cooperators, but it does seem like Mr. Castillo was somebody

20   who was more important there.

21          I mean, your Honor, I think coming down to it,

22   Ms. Harris has made some very good arguments.  She's made some

23   strong arguments, and she's an incredible lawyer.  It's true.

24          THE COURT:  She's what?  I'm sorry.

25          MS. ESTES:  She's an incredible lawyer.  It's true.

1          THE COURT:  I see.

2          MS. ESTES:  But it can't be that this defendant,

3     because he has a very good lawyer, is treated differently than

4     other people who had less serious conduct, like Mr. Ratti who

5     was just involved in drug dealing and got a year and a day.

6          Ms. Harris has made this great presentation, but she

7     can't change that her client was involved in three shootings,

8     one where he hit somebody in the arm, a shooting that could

9     just as easily, you know -- there's a chance it could turn into

10    a murder if the bullet had gone a little differently.

11         This is very serious conduct, these shootings.

12         THE COURT:  All right.  I understand your position.

13         MS. ESTES:  OK.

14         THE COURT:  Let me put it like this.  Is the

15    government arguing for a 39-month, guidelines sentence?

16         MS. ESTES:  Your Honor, we are seeking a guidelines

17    sentence, but I would say that I think, primarily, I believe

18    there should be a form of incarceration.

19         THE COURT:  All right.

20         MS. HARRIS:  Your Honor, may I?

21         I forgot to mention, and I know it's in our papers,

22    but I just want to remind the Court that my client, for 14

23    months, has been on a curfew with location monitoring, so he

24    has been subject to fairly significant restraints as part of

25    his pretrial conditions, and I would ask the Court that,

IapWcas2

1    whatever sentence the Court fashions, that be taken into
2    account.
3          THE COURT:  How long has that been?
4          MS. HARRIS:  Since August of 2017, your Honor, so
5    almost 14 months exactly.
6          And then, your Honor, the other thing, just one more
7    piece of evidence about where Mr. Castillo's head has been at
8    is that he did self-surrender on these charges.
9          THE COURT:  I remember that.
10          MS. HARRIS:  Yes.
11          THE COURT:  All right.  This is what I'm going to do.
12    I do agree with the government at this point that some
13    incarceration is necessary, but what I want you to do,
14    Ms. Harris, is to get me some specific alternatives of
15    programs.  They may be in addition to incarceration, or you may
16    change my thinking entirely, but I'm going to adjourn the
17    sentencing here.
18          How much time do you need?  I don't mean to be harder
19    on the defendant.  Sometimes certainty is better than just
20    putting this off, but let's do it.
21          MS. HARRIS:  We welcome the opportunity, your Honor.
22          I would say maybe two or three weeks to submit
23    something.  It will just take some time.
24          THE COURT:  And I need to analyze it myself and speak
25    with the probation people afterwards.  Your part is two to

1  three weeks.

2           MS. HARRIS:  Correct.  That's what I meant.

3           THE COURT:  All right.  Let's adjourn this to November

4  28.  I believe Thanksgiving is the week before.

5           All right.  November 28 at 4 p.m.

6           MS. HARRIS:  Your Honor, is there any way to do it in

7  the morning that day?

8           THE COURT:  Yes, of course.

9           MS. HARRIS:  OK.

10          THE COURT:  Let's do it at 10 a.m.

11          MS. HARRIS:  Perfect.

12          THE COURT:  I don't know where my deputy is.  I don't

13  know whether I have a trial then or not, but right now we'll do

14  it at 10 a.m.  If I have a trial, we'll move it up to 9.  All

15  right?

16          Sentencing is adjourned to November 28.  Within two to

17  three weeks, get me some specifics.

18          We have to make it the 29th.  My clerk informs me the

19  28th is not available.

20          MS. HARRIS:  Is the 27th possible, Judge?

21          THE COURT:  Just a moment.

22          I can do it on the 29th.  What were you asking,

23  Ms. Harris?  Were you asking for something else?

24          MS. HARRIS:  Whether the 27th is possible, or the

25  30th.  I have some obligations, conflicts on the 29th.  I could

IapWcas2

1  change them, if necessary.

2           THE COURT:  The 30th.

3           MS. HARRIS:  The 30th?  OK.

4           THE COURT:  Sentencing November 30, 10 a.m.

5           But I'm going to need some time to speak to the

6  probation people after you give me those proposals.

7           MS. HARRIS:  Yes.

8           THE COURT:  And I don't mean to get hope up because I

9  may just discard them, and I do think some incarceration is

10  appropriate.

11           Anything else at this time, government?

12           MS. ESTES:  Your Honor, we would just ask for

13  permission to submit something in response.

14           THE COURT:  In response to the proposals, you mean, or

15  in response to this argument?

16           MS. ESTES:  Yes, your Honor, in response to the

17  proposals.

18           THE COURT:  Sure.  Of course.

19           Thank you.

20           MS. HARRIS:  Thank you very much.

21           (Adjourned)

22

23

24

25